**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ALPHA FOUNDERS HOLDING, LLC,

            Plaintiff,

vs.

MAGELLAN HEALTH, INC.,

            Defendant.

No. 17-CV-6225

ORAL ARGUMENT REQUESTED

**SEALED/SENSITIVE**

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ALPHA FOUNDERS HOLDING, LLC'S MOTION FOR A PRELIMINARY INJUNCTION

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
(212) 468-8000

*Attorneys for Alpha Founders Holding, LLC*

ny-1306255

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

ARGUMENT ........................................................................................................................ 6

I. MAGELLAN'S PROCEDURAL ARGUMENTS ARE BASELESS. ............................ 6

    A. Founders' Claims Are Properly Brought as Direct Claims Against Magellan. ................................................................................................. 6

    B. There Are No Necessary and Indispensable Parties Under Rule 19. ..................... 7

    C. Founders Has Standing. ................................................................................ 8

II. FOUNDERS HAS DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF. ........................................................................................................ 9

    A. Founders Will Suffer Irreparable Harm Absent an Injunction. ............................. 9

    B. Founders Is Likely to Succeed on the Merits of Its Claims. ................................ 11

    C. The Equities Strongly Favor Founders. ............................................................. 14

CONCLUSION .................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Insured Mortg. Inv'rs v. CRI, Inc.*,
  1990 U.S. Dist. LEXIS 15787 (S.D.N.Y. Nov. 26, 1990) ................................................... 9, 10

*Bank of N.Y. Co. v. Ne. Bancorp, Inc.*,
  9 F.3d 1065 (2d Cir. 1993) ........................................................................................................ 9

*Crouse-Hinds Co. v. InterNorth Inc.*,
  634 F.2d 690 (2d Cir. 1980) ................................................................................................. 7, 8

*Etuk v. Slattery*,
  936 F.2d 1433 (2d Cir. 1991) ................................................................................................... 8

*Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*,
  1998 WL 71836 (Del. Ch. Mar. 5, 1998) ........................................................................... 13, 14

*Odyssey Partners v. Fleming*,
  1998 WL 155543 (Del. Ch. Mar. 27, 1998) .......................................................................... 6, 7

*Police & Fire Ret. Sys. of Detroit v. Bernal*,
  2009 Del. Ch. LEXIS 111 (Del. Ch. June 26, 2009) ................................................................ 9

*Reis v. Hazelett Strip-Casting Corp.*,
  28 A.3d 442 (Del. Ch. 2011) ................................................................................................... 11

*Robert M. Bass Grp., Inc. v. Evans*,
  552 A.2d 1227 (Del. Ch. 1988) ................................................................................................ 9

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
  770 A.2d 536 (Del. Ch. 2000) ................................................................................................. 12

*Trilogy Portfolio Co., v. Brookfield Real Estate Fin. Partners, LLC*,
  2012 Del. Ch. LEXIS 14 (Del. Ch. Jan 13, 2012) .................................................................... 9

**Other Authorities**

N.Y. Comp. Codes R. & Regs. Title 10, § 98-1.10(c) .................................................................... 3

Fed. R. Civ. P. 19 ....................................................................................................................... 7, 8

# INTRODUCTION[1]

This action arises as a result of the ongoing course of misconduct by Magellan since it acquired a controlling stake in AlphaCare. Rather than act for the benefit of AlphaCare and its minority stockholders, Magellan has run AlphaCare into the ground, rapidly depleting its assets and purporting to buy Founders out for just $1. Having failed to obtain Founders' stake on the cheap, Magellan now has tried to force a merger between AlphaCare NY and another company for its own benefit. This merger is the result of wholly unfair actions by Magellan. After springing this merger upon Founders, Magellan then convened a meeting on October 6 to consider an oral fairness opinion—a critical piece of the merger approval process—while Founders' designees were noticeably absent. Indeed, as Magellan knows half of Founders' board designees and the majority of its business partners are Orthodox Jews and therefore, were unavailable on October 6 in observance of a Jewish holiday. But Magellan's misdeeds do not stop there. Magellan then circulated a meeting notice on a Friday afternoon—just minutes before a Monday meeting—attaching the critical written fairness analysis. Because of the Jewish Sabbath, Founders was again left with little time to prepare. Magellan now complains that stopping this merger somehow prejudices it but any prejudice is its own doing. Indeed, absent an injunction, Founders will suffer significant harm.

---

[1] References to "Opening Brief" or "OB" are to the Memorandum of Law in Support of Alpha Founders Holding, LLC's Motion for a Temporary Restraining Order and Preliminary Injunction; references to "Ex. __" are to exhibits to the Declaration of James J. Beha II filed in support of the Opening Brief; references to "Opposition" or "DB" are to Defendant Magellan Health, Inc.'s Memorandum of Law in Opposition to Alpha Founders Holding, LLC's Motion for a Preliminary Injunction; references to "Como Decl." are to the Declaration of Anthony Como in support of the Opposition; references to "Tcherepnin Decl." are to the Declaration of Nicholas Tcherepnin in support of the Opposition; references to "DH Decl." are to the Declaration of David Harrington filed contemporaneously herewith; references to "TRO Tr." are to the transcript of the temporary injunction hearing held on Oct. 26, 2017. Unless otherwise stated herein, capitalized undefined terms have the same meaning as in the Opening Brief and internal case citations are omitted.

## FACTUAL BACKGROUND

Magellan and Founders' business relationship developed in 2013 resulting in several investments by Magellan in the entity Founders established, AlphaCare NY. (DH Decl. ¶ 7.) After these investments, Magellan and AlphaCare NY formalized their arrangement in a Stockholder Agreement. (*Id.* ¶ 9.) AlphaCare NY became a wholly-owned subsidiary of AlphaCare with Magellan as the controlling stockholder of AlphaCare

With this control, Magellan appointed three of AlphaCare's five directors. (*Id.* ¶ 10.) Founders appointed the remaining two directors if it owned at least 10% of the total issued and outstanding common stock of the company. (*Id.* ¶ 10.) This allowed Founders to influence the operations and management of the company to protect its position and the interests of the plan members. The Stockholder Agreement also provided Magellan with an option to purchase Founders' shares in the company beginning on January 2017, at a price based on a multiple of the company's previous year's earnings. (DB at 2.)

Between 2013 and 2015, Magellan caused AlphaCare to issue and sell additional preferred shares to Magellan, diluting Founders' stake in the company. (DH Decl. ¶ 11.) This resulted in Founders holding 85.4% of AlphaCare's 68,453 common shares, while Magellan holds the remaining common shares and preferred shares that are convertible into 294,249 common shares. (*Id.* ¶ 11.) Magellan now argues that those transactions were necessary and that Founders chose "not to fund AlphaCare Holdings' ongoing capital needs." (DB at 1.) ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[2] Under New York Health Department regulations,

> The commissioner's and … the superintendent's prior approval shall be required for the following transactions between a controlled MCO and any person in its holding company system: sales, purchases, exchanges, loans,



In addition to causing AlphaCare to engage in unnecessary dilutive financing transactions, Magellan also engaged in a scheme to artificially lower AlphaCare's profitability in order to permit Magellan to exercise its option to purchase Founders' shares for nothing.  Among other things, Magellan caused Founders to forego valuable business opportunities and to pay Magellan exorbitant management fees, including paying Magellan for work performed on behalf of other Magellan affiliates which provided no benefit to AlphaCare.

In January 2017, on the first day that its contractual option went into effect, Magellan purported to exercise its option to purchase all of Founders' stock for $1.  (DB at 2.)  In response, AlphaCare brought suit against Magellan for breach of fiduciary duty in Kings County

---

extensions of credit or investments the aggregate of which involves five percent or more of the MCO's admitted assets at last year-end.

N.Y. Comp. Codes R. & Regs. Tit. 10, § 98-1.10(c).

Supreme Court. After Founders filed suit, Magellan initiated an action in Delaware Chancery Court seeking to force Founders to sell its shares.

In July 2017, Magellan announced plans to acquire Senior Whole Health ("SWH"), a healthcare company providing Medicare and Medicaid dual-eligible benefits to members in Massachusetts and New York. (OB at 3.) SWH operates in New York through a wholly owned subsidiary, Senior Whole Health New York, Inc. ("SWH NY").

While the two separate lawsuits concerning the propriety of Magellan's purported exercise of its option to purchase Founders' shares remained ongoing—and before either Court had considered the merits of the parties' positions—Magellan saw its acquisition of SWH as an opportunity to effectively reach the same result it was seeking through its improper exercise of the option under the Stockholder Agreement: by merging AlphaCare with SWH NY, Magellan would find another way to seize Founders' interest in AlphaCare. (*Id.* ¶ 14 )

On the afternoon of Friday, September 22, 2017, Magellan provided the directors of AlphaCare and AlphaCare NY with notice of the third quarter board meetings for each company to be held on September 27, 2017. (*Id.* ¶ 15; Como Decl. Ex. A.)

On September 27, 2017, the boards of both companies convened to discuss, among other things, the proposed merger between AlphaCare NY and SWH NY (the "Merger"). (Como. Decl. Ex. A.) At the meeting, the boards discussed the retention of Mercer Capital ("Mercer") to provide a fairness opinion with respect to the proposed Merger but no fairness opinion was presented. (*Id.*; DH Decl. ¶ 17.) The board also approved a resolution to "conditionally approve[ ]" the merger agreement, "subject to further board action to determine the number of shares of AlphaCare Holdings common stock which will be issued to [SWH] in the merger" and "the receipt of a fairness opinion regarding such consideration." (DH Decl. Ex. B at 11, 12-13.)

The summary of the transaction provided to the board noted that "[u]nder the terms of the merger agreement, the board of AlphaCare of NY will have the right to abandon the merger at any time before it becomes effective." (*Id.* at 11)  Thus, it was clear that the resolution approved at this meeting did not involve final approval of the Merger and that the Merger remained contingent on approval of the board following receipt and consideration of a fairness opinion.  Thus, Founders left that meeting expecting to receive more information to better understand the Merger, including Mercer's fairness opinion, before the Merger was approved.  (DH Decl. ¶ 17.)

On October 4, 2017, Magellan circulated a notice for a board meeting to occur two days later, on October 6, to discuss, among other things, final approval of the Merger.  (Como Decl. Ex. C.)  Although the agenda indicated that the boards would consider Mercer's fairness opinion, the fairness opinion was not attached to the email notice.  (*Id.*)  Within hours, one of Founders two board designees who is an observant Orthodox Jew, responded to the email informing Magellan that the October 6 meeting fell during observance of the Sukkot holiday, which began on the afternoon of October 4, and that he could not participate in a board meeting on October 6.  (*Id.* at Ex. E.)  Because of the Sukkot holiday, this director (and most of Founders' other investors, who are also Orthodox Jews) could not access email or the telephone or conduct business of any kind from sundown on October 4 and until sundown on Sunday, October 8.  (DH Decl. ¶ 19.)

Magellan refused to re-schedule the meeting to accommodate the Founders' religious observance.  Indeed, Magellan did not even respond to the email until the following morning—at which point this director and most of the Founders were unable to conduct business (or to take any legal action to forestall the meeting).  (Como Decl. Ex. E.)  In its email explaining its refusal to re-schedule the meeting, Magellan represented that the meeting would have to proceed as

-5-

scheduled because "we are under a NY DOH deadline." (*Id.*) But nothing in the materials presented and discussed at the September 27 meeting suggested that there was an impending deadline for approval of the Merger. Incredibly, at the hearing on Founder's motion for a temporary restraining order (the "TRO Hearing"), Magellan's counsel faulted Founders' designees for failing to attend the October 6 meeting, while failing to tell the Court that they were unable to attend because Magellan refused to accommodate one designee's religious observance.[3] (*See* TRO Tr. at 25-26 ("[Founders] simply did not show up on October 6th.").)

Consistent with its practice of sending last-minute notices to Founders' designees, on Friday, October 20, 2017, minutes before the start of the Jewish Sabbath, Magellan provided notice of an AlphaCare board meeting to be held the following Monday. (DH Decl. ¶ 20.) The email notice included copies of Mercer's fairness opinion and analysis. (Exs. G, I, & K.) Despite the fact that the fairness opinion is dated October 6, this was the first time Magellan provided those documents to Founders. (DH Decl. ¶ 22.) Upon receipt of this last-minute notice, Founders began preparing to initiate this action and filed this action and motion on Wednesday, October 25, 2017. (*Id.* at ¶ 21)

## ARGUMENT

### I. MAGELLAN'S PROCEDURAL ARGUMENTS ARE BASELESS.

#### A. Founders' Claims Are Properly Brought as Direct Claims Against Magellan.

As an initial matter, Founders properly asserts direct claims against Magellan as controlling stockholder of AlphaCare. Under Delaware law, a minority stockholder may bring a direct claim against a controller for breach of fiduciary duty. *Odyssey Partners v. Fleming*, 1998

---

[3] While Mr. Harrington, Founders' other designee, was not observing Sukkot, he was unable to communicate with the other Founders' designee or any of his other business partners in advance of the meeting. (DH Decl. ¶ 19.) And Founders' legal counsel was travelling out of the country for another matter between October 4 and 6. (*Id.*) Unable to discuss the matter with either legal counsel or any of his business partners, Mr. Harrington chose not to attend the meeting.

-6-
ny-1306255

WL 155543, at *3 (Del. Ch. Mar. 27, 1998).  In *Fleming*, the controlling stockholder "engaged in a course of unfair dealing, accomplished by an improper exercise of control over Holding and a majority of its board of directors, which culminated in Fleming's purchase of all of the assets of Holding" on the cheap.  *Id.*  A direct injury existed where the controlling stockholder "controlled Holding and its board of directors and exercised that control disloyally to usurp for itself the entire value of the minority's shareholdings." *Id.* at *4.

Here, Founders has suffered from the ongoing disloyal course of unfair dealing by Magellan.  From the beginning, Magellan has manipulated the value of AlphaCare for its own benefit, resulting in a severe diminution of value.  (DH Decl. Ex. A.)  With the value depleted, Magellan then sought to take Founders' stock on the cheap and later caused this Merger to occur for its own benefit.

### B. There Are No Necessary and Indispensable Parties Under Rule 19.

Magellan claims that AlphaCare NY, SWH NY, and AlphaCare are necessary and indispensable parties here.  (DB at 7-10.)  Not so.  Founders seeks injunctive relief against Magellan to prevent Magellan from taking further actions to advance a merger of AlphaCare and SWH NY.  Founders is not seeking to set aside a merger agreement between AlphaCare and SWH NY because no merger agreement has been executed and, in any event, any transaction remains contingent on Magellan's board designees finally approving the merger.  (Ex. H.)  Thus, unlike the sole decision on which Magellan relies, enjoining Magellan from taking further steps to consummate the merger would not affect the contractual rights of AlphaCare or SWH NY.  In *Crouse-Hinds Co. v. InterNorth Inc.*, 634 F.2d 690, 701 (2d Cir. 1980) (cited in DB at 8), the Second Circuit determined that an absent party, Belden, was a necessary party under Rule 19 because "[t]he counterclaims seek to enjoin Crouse-Hinds's performance of the Exchange Agreement, to which Belden is a party and in reliance on which, we are informed, Belden has

materially altered its financial structure." *See also id.* ("since Belden's rights thereunder [the Exchange Agreement] would clearly be prejudiced if the relief sought by InterNorth were to be granted, Belden's presence is required."). But neither AlphaCare, AlphaCare NY, nor SWH NY has entered into a merger agreement or other binding contract, nor do they have any other legal rights that would be prejudiced by an injunction against Magellan.

Magellan argues that "AlphaCare NY and SWH NY are the parties to the merger and their business and rights under the already approved merger will be prejudiced if the preliminary injunction is granted." (DB at 9.) But AlphaCare's board resolution approving the merger does not bestow any legal rights on AlphaCare NY or SWH NY. They certainly have no legal right to enforce a resolution of AlphaCare's board. And the fact that a third-party's "business" may be affected by the outcome of a case does not make that party a necessary party under Rule 19.

### C. Founders Has Standing.

Magellan also argues that Founders lacks standing because Magellan has purported to exercise an option to purchase Founders' shares. But there is no dispute that Founders currently holds stock in AlphaCare (DB at 10-11)—and, therefore, has standing as a stockholder to assert claims against the controlling stockholder. *Etuk v. Slattery*, 936 F.2d 1433, 1440-41 (2d Cir. 1991). The propriety of Magellan's option is being litigated in the Delaware Chancery Court and that court has not considered the merits of Magellan's claim. Indeed, Founders has not yet even answered the complaint. Magellan essentially seeks to make an end run around the Chancery Court by executing the proposed merger of AlphaCare NY and SWH NY—wiping out Founders' interest in AlphaCare—before the Chancery Court can decide the legitimacy of Magellan's purported exercise of its option. To do so, it asks this Court to assume Magellan's position is correct before the Chancery Court has done so.

## II. FOUNDERS HAS DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF.

### A. Founders Will Suffer Irreparable Harm Absent an Injunction.

Absent an injunction, Founders will suffer irreparable harm. (OB at 9-10; ¶¶ 20-35.) First, in the corporate control context, the threat of irreparable harm is particularly strong because once a corporate transaction "has been consummated, restoration of the status quo may be impossible." *Bank of N.Y. Co. v. Ne. Bancorp, Inc.*, 9 F.3d 1065, 1067 (2d Cir. 1993). This is so because if the Merger is permitted to close, "it becomes difficult and sometimes virtually impossible for a court to 'unscramble the eggs.'" *Am. Insured Mortg. Inv'rs v. CRI, Inc.*, 1990 U.S. Dist. LEXIS 15787, at *19 (S.D.N.Y. Nov. 26, 1990). The Opposition does not refute this.[4]

Here, Founders, as minority stockholders, will lose an opportunity that cannot be regained once the transaction closes. *Robert M. Bass Grp., Inc. v. Evans*, 552 A.2d 1227, 1246-47 (Del. Ch. 1988) (irreparable harm where the effects of the challenged transaction could not later be reversed); *Police & Fire Ret. Sys. of Detroit v. Bernal*, 2009 Del. Ch. LEXIS 111, at *1 (Del. Ch. June 26, 2009) ("[I]t would be impossible to 'unscramble the eggs' by attempting to unwind the merger once it has been completed.").

Second, there is a sufficient threat of irreparable harm where, as here, after-the-fact damages would be difficult to calculate or insufficient to redress the suffered injury. *See Trilogy Portfolio Co., v. Brookfield Real Estate Fin. Partners, LLC*, 2012 Del. Ch. LEXIS 14, at *19 (Del. Ch. Jan 13, 2012) (noting that in corporate transactions, there is "a threat of irreparable harm ... in cases where an after-the-fact attempt to quantify damages would involve [a] costly exercise[] in imprecision and would not provide full, fair, and complete relief for the alleged wrong"). Indeed, "[i]n corporate control contests, the stage of preliminary injunctive relief,

---

[4] Defendant claims that the cases in the Opening Brief are distinguishable but, tellingly, Defendant only offers up distinctions for two of those cases and ignores the reasoned precedent showing that injunctive relief is appropriate pre-merger. (*Compare* DB at 17 *with* OB at 9-10.)

rather than post-contest lawsuits, 'is the time when relief can best be given.'" *Am. Insured Mort. Investors*, 1990 U.S. Dist. LEXIS 15787, at *18. That is precisely why Founders is acting now.[5]

Here, Founders is threatened by a scheme involving multiple transactions and an unfair course of dealing designed to deprive Founders of its bargained-for, paid-for rights. From the outset, Magellan has undertaken to steal the company from Founders on the cheap and has exercised its position of dominance and control of the board to run the company for its benefit and force its own self-interested agenda to the detriment of the minority stockholders. Presently, holding two out of five board seats permits Founders to exercise a level of authority that it will never recapture post-merger. In this position, Founders is able to influence the policies and direction of the company and represent and protect the interests of the minority stockholders. After the Merger, Founders' diluted ownership position risks a loss of its board seats, and even if it still holds two out of ten seats on the post-Merger board, its relative position will be reduced. (DB at 14-15; OB at 9.) If the Merger is permitted to close, Founders, as directors, will forever be deprived of its relative position and influence on the AlphaCare board and Founders, as minority stockholders, will suffer permanent dilution of its position within the company. Put simply, no amount of money damages can compensate Founders for its threatened losses.

Lastly, Founders did not unreasonably delay bringing this action. Indeed, as shown above, Founders acted as soon as it had sufficient information illustrating the exigency of the situation. Contrary to Defendant's claims at the TRO Hearing, Founders did not possess the fairness opinion and accompanying analysis until just before sundown on the Friday before the Monday, October 23 meeting. The facts are as follows:

---

[5] While Founders seeks $10 million *in the alternative* in its Prayer for Relief, this is not a concession that money damages are sufficient. (DB at 12.)

- On September 27, AlphaCare NY convened a board meeting. (*See generally* Como Decl. Ex. A.) At that meeting, the board considered a resolution to engage Mercer to provide a fairness opinion concerning the Merger. (*Id.* Ex. F.)

- In advance of the October 6 meeting, Magellan circulated an agenda on October 4. (*Id.* Ex. C.) The materials circulated did not include the fairness opinion or analysis. (*Id.*)

- On October 4, one of Founders' designees advised that he could not attend the meeting because of the Sukkot holiday. (*Id.* Ex. E.) Sukkot began that afternoon and continued through Sunday. (DH Decl. ¶ 20.)

- Rather than accommodate this reasonable request, on October 5, Magellan advised that the meeting could not be rescheduled. (Como Ex. E.)

- The October 6 meeting occurred without the presence of either Founders' representative. One director was observing Sukkot and Mr. Harrington felt ill-advised to attend without first being able to confer with his fellow principal or counsel over the substance of the meeting. (DH Decl. ¶ 19.) Based on Magellan's representations, Mercer provided its oral analysis that day outside of the presence of either Founders director. (DB at 20.) The three Magellan designees then approved the Merger without any input from Founders.

- On Friday, October 22—just before one of Founders' directors closed his electronic devices and began observing the Sabbath—Magellan sent a notice for a Monday meeting and for the first time included the Mercer fairness opinion and analysis. Because of this timing, this director was unable to communicate with his counsel or his partners as to the appropriate course of action. (DH Decl. ¶ 21.)

At bottom, Magellan intentionally hamstrung Founders and now accuses Founders of undue delay.

### B. Founders Is Likely to Succeed on the Merits of Its Claims.

The Opposition wrongfully argues that the Merger was entirely fair. (DB at 19.) But the Merger process demonstrates its ultimate unfairness. As shown in the Opening Brief, Magellan has the burden of proving the entire fairness of the Merger. (OB at 8 (citing *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *16 (Del. Ch. Dec. 21, 2006)).) This has been described as the "most onerous standard" under Delaware law. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011). Defendant cannot meet this burden.

"The test of entire fairness is an 'exacting' one and, where it applies, the 'challenged transaction must withstand rigorous judicial scrutiny.'" *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 553 (Del. Ch. 2000). Entire fairness involves two elements: fair price and fair dealing. *Id.* "Fair dealing 'embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.'" *Id.*. "Fair price relates to the economic and financial considerations of the proposed [transaction]." *Id.*.

Defendants cannot show that the process was fair. First, the transaction was undertaken at Magellan's behest to satisfy its own self-interested business objective—to acquire Senior Whole Health. (Tcherepnin Decl. ¶¶7, 10; *T. Rowe*, 770 A.2d at 554 (finding reasonable likelihood of success on the merits where defendants were unlikely to satisfy entire fairness because, among other reasons, "[t]he timing of the transaction is driven entirely by Resurgence's desire to rescue its investment in Levitz").) Indeed, it is structured in violation of a "fundamental principal of Delaware corporate law that a controlling stockholder may not use corporate assets to advantage itself to the corporation's disadvantage." *Id.* at 555.

Second, Magellan stands on both sides of the transaction and there is no indication that this transaction is the result of arm's-length negotiations. *Id.* ("Arm's length negotiation between independent bargaining parties is a 'well recognized touchstone of fair dealing.' Conversely, its absence is evidence of unfair dealing."). Indeed, Magellan has not even attempted to show how this Merger would be beneficial to AlphaCare. To the contrary, Magellan admits that the Merger is being pursued to advance *Magellan's* interest, not because it is in the interests of AlphaCare, its investors, or its members. ███████████████████
███████████████████████████████████████████████████

-12-

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████

Third, the inequitable approval process by the directors cuts against fairness. Incredibly, Magellan argues that the merger process was fair because the Merger was the product of "Board deliberations" at the October 6, 2017 meeting. (DB at 20.) But, of course, Magellan's decision to convene the October 6 meeting shows that the process was unfair. Magellan knew full well that one of Founders' designees and all but one of the other Founders were Sabbath-observant Jews. Under the circumstances, it strains credulity to think that holding the meeting on a Jewish holiday was coincidence. But even if it were, once this director informed Magellan of the conflict, there should have been no question that the meeting would be re-scheduled. It is axiomatic that "all directors have equal rights of access to board information and to participate fully in board proceedings." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1998 WL 71836, at *7 (Del. Ch. Mar. 5, 1998). And Magellan provides no explanation for its failure to provide Founders with the fairness opinion and analysis—which is dated October 6—before October 20.[6]  R. Franklin Balotti and Jesse A. Finkelstein, The Delaware Law of Corporations

---

[6] At the TRO Hearing, counsel for Magellan incorrectly suggested that Magellan sent the fairness opinion materials to Founders in advance of the October 6 meeting. (*See* TRO Tr. 7:14-20 ("The Board … meeting, sorry, Your Honor, that was yesterday, was originally Monday. All it was, was the implement policies that had already been implemented on October 6th. If I say -- or approved. If I can say, Your Honor, in terms of getting nothing. That is not true. They received the Fairness Opinion, which I believe is exhibit I.").  While we are confident that this misstatement was an honest mistake, in its brief, Magellan seeks to suggest the same things, stating that "On October 4, 2017, the Founders Directors received the agenda and materials for the October 6, 2017 meeting, which included final approval of the Agreement and Plan of Merger and consideration of the Mercer Capital fairness opinion." (DB at 20.) To be clear, Founders received an agenda stating that the Fairness Opinion would be

and Business Organizations § 4.8[E] (3d ed. 2017) ("one would expect that all directors ... must have access to all of the information and material upon which a decision is based in order to discharge properly their duty of due care.").

Here, Founders was not afforded equal access to information considered at the October 6 meeting. Indeed, where, as here, the directors' absence from a meeting was caused by the other directors' wrongdoing, such actions have been deemed void. *Moore*, 1998 WL 71836, at *7 ("Delaware law is well settled that board action taken in the absence of a director, where the absence is obtained by trickery or deceit or where notice of a special meeting was not given to a director, is void."). In *Moore*, the court found board action void where the director belatedly obtained the information "long after" the challenged vote occurred. *Id.* at *9. Similarly here, consistent with its past practice, Magellan provided minimal notice of the meeting, which was scheduled for a Jewish holiday. Magellan opted to hold the meeting over the Founders' designee's objections and considered the fairness opinion which was critical to the approval of the Merger and advised on whether the Merger was fair to *all* stockholders, including the minority represented by Founders. No minority board designees were present to consider this and approve the Merger. The Founders' designees only obtained the fairness materials *weeks* later *after* the board already approved the challenged transaction. This approval by three Magellan designees alone is sufficient to find that the Merger process was far from fair.

### C. The Equities Strongly Favor Founders.

In light of Magellan's pattern of inequitable conduct, the balance of equities tilts heavily in Founders' favor. First, Magellan claims that it was forced to infuse capital into AlphaCare to keep it afloat because the Founders refused to do so. (DB at 2.) ███████████████

---

considered at the meeting. But Founders *did not* receive a copy of the opinion or the underlying analysis until October 20.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Second, Magellan improperly sought to jam this Merger through without permitting the Founders' designees access to and an opportunity to consider the fairness materials as well as an opportunity to participate in the deliberations on October 6, during which the Board made one of the most critical decisions in the life and death of a corporation by deciding to merge AlphaCare NY with SWH NY. Such decisions should not be made lightly and should reflect the reasoned judgment of a fully informed board, including disinterested board members.

Magellan argues that the equities favor permitting the Merger to go forward because Magellan mailed notices of the proposed Merger to plan members following the October 6 meeting. (DB at 4.) Magellan's decision to go forward with that meeting in the first instance, and approve the Merger when Founders had not even been provided the fairness opinion, demonstrates that the equities favor Founders. But Magellan's decision to send notices to plan members immediately following that meeting—knowing that the Merger had been approved in the absence of Founders' representatives and that litigation was ongoing between the parties in multiple different courts—is simply astounding. Under the circumstances, Magellan knew full well that Founders would have no choice but to bring suit to protect its rights. And Magellan chose to use the Plan's members as a pawn for an advantage in any litigation. Magellan's argument that "the elderly, frail, and disabled" (*id.*) will be harmed unless Magellan is permitted to go forward with an unfair Merger is a cynical ploy. To the contrary, Magellan's conduct shows its utter lack of concern for the Plan's members.

## CONCLUSION

For these reasons, Founders respectfully requests that the Court grant its Motion.

Dated: November 22, 2017　　　　　　/s/ *James J. Beha II*
　　　　　New York, New York

　　　　　　　　　　　　　　　　　　MORRISON & FOERSTER LLP

　　　　　　　　　　　　　　　　　　James J. Beha II
　　　　　　　　　　　　　　　　　　Christina L. Golden
　　　　　　　　　　　　　　　　　　250 West 55th Street
　　　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　　　(212) 468-8000
　　　　　　　　　　　　　　　　　　jbeha@mofo.com
　　　　　　　　　　　　　　　　　　cgolden@mofo.com

　　　　　　　　　　　　　　　　　　*Attorneys for Alpha Founders Holding, LLC*

-16-